**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-00198-ACR** |
| **v.** | : | |
| | : | |
| **MICHELLE ALEXANDRA ESTEY, and** | : | |
| **MELANIE CHRISTINE BELGER** | : | |
| | : | |
| **Defendants.** | : | |

### GOVERNMENT'S CONSOLIDATED SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Michelle Estey and Melanie Belger have each pleaded guilty to one second degree misdemeanor, a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four). For the reasons set forth herein, the government requests that this Court sentence Estey to 30 days' incarceration and Belger to 45 days' incarceration on Count Four and, consistent with their plea agreements in this case, $500 in restitution.

## I.       Introduction

The defendants, Michelle Estey and Melanie Belger ("Defendants"), friends who reside in California, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Estey is a 54-year-old woman who has worked in the past but is presently a homemaker. Belger is a 57-year-old woman who is self-employed in the financial world. The government's recommended sentence for Estey is warranted because she (1) spent nearly an hour on Capitol grounds on both the Upper West Terrace and Lower West Terrace amongst the violent rioters prior to entering the Capitol; (2) crawled through a smashed-out window to trespass inside the ransacked Room ST-2M; (3) remained in Room ST-2M while fellow rioters retrieved objects from that room to be used against police officers; and (4) made misleading and untruthful statements to the FBI and probation. The government's recommended sentence for Belger is warranted because she engaged in the same aggravating conduct as Estey. The government's recommendation for Belger is higher than for Estey because, unlike Estey, Belger also tweeted about violence towards then Vice President Mike Pence and stole a chair leg from ST-2M that rioters had broken off.

The Court must also consider that the Defendants' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for their actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Estey's crime support a sentence of 30 days' incarceration in this case and Belger's crime support a sentence of 45 days' incarceration in this case.

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.        Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 35.

### ***Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds***

Assaults against police on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk.  The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



**Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.**

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.  At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.  Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A.  At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.  Less than a minute later, with the

4

crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob. By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1. They flooded the area labeled "Lower West Plaza" Area C on Government's Exhibit 1, pushing against the barricade there.



**Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).**

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of

weaponry brought by members of the crowd or seized from the inaugural stage construction site.



**Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until Metropolitan Police Department (MPD) officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).**

Following the conclusion of former President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as

crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.





**Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).**

As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. However, the attempted breach and officer assaults that occurred at the LWT tunnel entrance to the Capitol Building, the location of perhaps the most violent confrontation on January 6, are deserving of further description as Estey and Belger entered the Capitol through a broken window directly north of the LWT tunnel.   The government does not contend that either Estey nor Belger were involved in the assaults at the LWT tunnel; however,

they were in very close proximity of the tunnel and had sufficient time and ability to witness some of the events at the LWT tunnel prior to their breach into the Capitol.

The entrance to the LWT tunnel usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance from the Capitol onto the Inaugural stage for the President-Elect and other dignitaries on Inauguration Day.

At approximately 2:42 p.m., a mob broke the windows to the first set of doors, and the police officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging police with batons, poles, chemical spray, bottles and other items. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.  During the resulting battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.  For over two hours, the battle raged, with multiple police officers suffering significant injuries as they fought hand to

hand to prevent rioters from breaching the entrance. Capitol Police Sgt. Aquilino Gonnell, who was present in the tunnel that day, explained:

> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT"). The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day. Exhibit 5; "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



**Exhibit 5**

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.  USCP officers,  assisted by MPD officers, were arrayed inside the doorway and guarding the entrance.  Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the police officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.  The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging police with batons, poles, chemical spray, bottles and other items.  Officers created a line in the doorway to block the rioters and physically engaged

them with batons and OC spray.  At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.  And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.  So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.  That's about from the distance where I'm sitting here on the dais to that back wall.  And from that office in close proximity to where you all held the line, I listened to you struggle.  I listened to you yelling out to one another.  I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.  And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."  Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at   https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat police officers.  The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against police, including the abduction and tasering of MPD Officer Michael Fanone and the previously mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.  Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle. *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor. MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service. *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 p.m..

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area. It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

*Defendants Estey and Belger's Role in the January 6, 2021 Attack on the Capitol*

Michelle Estey and Melanie Belger flew to Washington D.C. from California together. On January 6, they attended the former President's "Stop the Steal" rally and then had lunch and wine at a restaurant along Pennsylvania Avenue between the Ellipse and the U. S. Capitol.

13

Estey and Belger then joined with the crowd of rioters as they marched to the Capitol.  By the time Estey and Belger made it to the restricted grounds of the Capitol, thousands of rioters had breached the restricted grounds.  Estey and Belger eventually made it through the many rioters and entered the Capitol building itself.

Estey and Belger entered Room ST-2M which previously had been breached by other rioters. Unlike some of the areas that other rioters entered such as the Rotunda, the Crypt, and Statutory Hall, Room ST-2M is never open to the public. That room is adjacent to the LWT tunnel where officers were being assaulted and some of the most violent acts of January 6 took place.  In Exhibit 5, the ST-2M window is circled in green and the tunnel is circled in red, showing them directly adjacent to one another.

In order to enter Room ST-2M, the Defendants had to crawl through a broken window to access the building.



**Screen shot from Exhibit 6 at 2:06**

As can be heard in Exhibit 6, rioters who were inside the suite area at the same time as the Defendants made statements about getting gassed by the police. *Exhibit 6* at 1:30. Additionally, Exhibit 7 shows clouds of gas used by police officers trying to disperse the violent mob. *Exhibit 7* at 1:53 – 2:00.

The suite that Defendants occupied with other rioters suffered extensive damage, as shown in Exhibits 6, 7 and 8.  While the Defendants were in the suite, the sounds of rioters breaking objects and destroying furniture were readily apparent.  In addition, rioters were chanting, "Whose house? Our house" repeatedly.

The Defendants did not remain in the first room they enter. Rather, they entered several other rooms which make up the suite.  All the while, other rioters in the suite were destroying property and attempting to advance further into the Capitol. It was not until police officers made it to the breached window and ordered everyone out of the suite that the Defendants left the suite.

Additionally, while attempting to leave the suite, Belger carried the leg of a chair or table as she made her way out of Room ST-2M.



Exhibit 7 at 1:46

15

After leaving the Capitol and making her way back to her hotel, Belger posted on social media, "Back at hotel! Was in the Capitol im safe . .Pence = NOT SAFE."



**Exhibit 8**

*Estey's Post-plea Interview with the FBI*

On November 23, 2023, Estey gave a post-plea interview with the FBI.  During the interview, she admitted to traveling to Washington to see Trump speak.  Estey stated that after Trump's speech she and Melanie Belger went to a restaurant and ordered food and went to the restroom.  She stated she saw white vans driving to the Capitol and thought there may be another speech. Estey stated she did not witness any violence on the Capitol grounds nor saw any assaults on Capitol Police.

Estey stated she and Belger did not want to get separated while at the Capitol.  She stated they climbed to a higher level at the Capitol but eventually became separated from Belger for about 90 minutes when she walked down the steps to the lower west terrace.  Estey stated she was caught up in the crowd and that it was chaotic.  She stated she saw people being shot with rubber bullets and saw one person with a bloody face.  Estey stated she then entered the Capitol through a broken window.

Estey stated she then found Belger while inside the building.  Estey stated she saw a man breaking a table.  Estey advised the man offered her a leg from the table but Estey refused to take the leg.  Estey estimated she was inside the Capitol for approximately 7 minutes.  Estey stated she heard flash bang grenades outside the Capitol and was told by Capitol Police to leave the room, which she did.

Estey stated she was thrown to the ground by a Capitol Police Officer and was scared and in pain.  She stated she was again separated from Belger and called her. Belger told Estey she was in an ambulance.  Estey stated the call dropped and two men escorted Estey back to her hotel.

Estey stated she was remorseful for her actions on January 6, 2021 and wished she had never entered the window of the Capitol.  She stated she was sorry for doing something illegal.

Estey statement to the FBI agents was mis-leading and nonsensical.  By her own admission, Estey was on the Capitol terrace for more than an hour during some of the most violent conflicts between police officers and the violent crowd.  During an hour on the upper terrace and the lower terrace it would have been impossible to not have witnessed the violent clashes between rioters and police officers on January 6.

Additionally, although plausible, it is highly unlikely that Estey and Belger became separated for 90 minutes and then somehow found each other in the ST-2M suite.  According to Estey, they became separated on the Upper West Terrace.  Then, 90 minutes later she made her way to the lower west terrace which by this time was occupied by many rioters while officers and rioters engaged in physical combat at the LWT tunnel.  The crowd at that time was immense.  Then, according to Estey, she made her way into the broken window of Room ST-2M and found Belger.  Room ST-2M was breached by the violent rioters between approximately 4:45 – 5:00 p.m. and was occupied by less than 30 people on January 6.

In her statement to the Probation Office,  Estey stated that the Defendants "huddled against the wall" while inside the Capitol.  The video exhibits provided by the Government show this to be untrue.  The Defendants did not "huddle against the wall" in Room ST-2M. Rather, they made their way around every room of the suite while other rioters engaged in rampant property destruction all around them.

*Belger's Post-plea Interview with the FBI*

On November 23, 2023, Belger gave a post-plea interview with the FBI.  During the interview, she admitted to traveling to Washington to see Trump speak.  Belger stated that after Trump's speech she and Michelle Estey went to a restaurant and ordered food and went to the restroom.  She stated she saw people "milling" over to the Capitol but not "parading."  Belger

stated she saw white vans driving to the Capitol and then walked to the Capitol with Estey.  She stated she did not witness any violence prior to entering the Capitol building.  Nor did she see any police officers prior to entering the Capitol building.  Belger stated she became separated from Estey and things were a "frenzy."  She stated she saw people dodging rubber bullets and entered the Capitol because she was seeking safety from the chaos.

Belger stated she then found Estey while inside the building. Belger stated she and Estey huddled in a corner while in the Capitol.  Belger stated she saw a man breaking a table.  She stated she left once told to do so by police. She stated she injured her ankle at the Capitol and went to a hospital but was denied entry because she refused to wear a mask.

Belger stated she was remorseful for her actions on January 6, 2021 and never meant to interfere with the election and was seeking safety inside the Capitol Building.

Belger's statement to the FBI agents was also mis-leading and nonsensical.  By her own admission, Belger was on the Capitol at in the lower west terrace during some of the most violent conflicts between police officers and the violent crowd.  For Belger to see people dodging rubber bullets but state she saw no police officers prior to entering the Capitol is non-sense.  During her time on the lower terrace it would have been impossible to not have witnessed the violent clashes between rioters and police officers on January 6.

Additionally, although plausible, it is highly unlikely that Estey and Belger became separated for 90 minutes and then somehow found each other inside the Capitol building.

Belger's statement to the FBI following her plea was less than forthcoming.

### The Charges and Plea Agreement

On June 13, 2023 the United States charged the Defendants by a four-count Information with violating 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or

Grounds); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); 40 U.S.C. § 5104(e)(2)(D)(Disorderly Conduct in a Capitol Building); and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). On August 28, 2023, pursuant to plea agreements, Estey and Belger pleaded guilty to Count Four of the Information, charging them with a violation of 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building).  By plea agreement, the Defendants agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Estey and Belger now face sentencing for violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, the Defendants face up to six months of imprisonment and a fine of up to $5,000. They must also pay restitution under the terms of their plea agreements. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days' incarceration for defendant Estey and 45 days' incarceration for defendant Belger.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while

staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Estey's and Belger's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendants like Estey and Belger, the absence of violent or destructive acts is not a mitigating factor. Had Estey and Belger engaged in such conduct, they would have faced additional criminal charges.

One of the most important factors in Estey's case is her untruthfulness regarding the events of January 6, 2023.  Estey's statement to the FBI after her plea was misleading at best, knowingly false at worst.

Belger's FBI statement was similarly misleading, if not as obviously false. In addition, Belger implicitly alluded, apparently without regret, to future violence against then Vice President Pence in a social media post. Finally, it appears that Belger stole, or attempted to steal, a broken chair leg from Room ST-2M, perhaps as a trophy of her unlawful conduct on January 6.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration for both Defendants in this matter.

### B.  History and Characteristics

#### a.  Estey's History and Characteristics

Before January 6, Estey has lived a law-abiding life. There is no excuse for her behavior that day. Estey still refuses to fully recognize the seriousness of her actions which is exemplified by her attempt to mislead FBI agents.

### b.  Belger's History and Characteristics

Before January 6, 2021, Belger has lived a law-abiding life. There is no excuse for her behavior that day.  Belger still refuses to fully recognize the seriousness of her actions which is exemplified by her attempt to mislead FBI agents.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by these Defendants. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to these Defendants weighs heavily in favor of a term of incarceration.  Both Estey's and Belger's misleading statements to the FBI after their guilty pleas illustrate a need for specific deterrence from similar conduct in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Estey and Belger based on their own conduct and relevant characteristics, but should give substantial weight to the context of their unlawful conduct: their participation in the January 6 riot.

Estey and Belger have pleaded guilty to Count Four of the Information charging them with 40 U.S.C. § 5104(e)(2)(G).   This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." "Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012); *see United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few

months are less likely to cause an unwarranted disparity than differences measured in years. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in Room ST-2M as did the defendant.  In *United States v. Mariposa Castro*, 21-cr-299-RBW, the defendant attended the Stop the Steal rally and then returned to her hotel room seeming to be done for the day, similarly to Estey and Belger who went to have lunch.  Both Castro and the Defendants then saw and heard people going to the Capitol and decided to go the Capitol along with other rioters.  Although the Defendants did not film themselves as did Castro, while inside Room ST-2M they all saw and heard the same chaos.  The occupation of ST-2M was rather brief on January 6 and the people who occupied the suite were able to see and hear the actions and destruction that took place in the suite on the day of the riot.  Judge Walton sentenced Castro to 45 days' incarceration and a $5000 fine.

In *United States v. Honneycutt*, 22-cr-50-CJN, the defendant, like Defendants here, witnessed the destruction inside Room ST-2M, although Honeycutt took the additional effort to film the destruction he was witnessing. Unlike the Defendants, Honeycutt took the additional step of passing a long wooden plank outside the Capitol to other rioters to use against police officers. Judge Nichols sentenced Honeycutt to 90 days' incarceration.

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## IV.   Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that the defendants must pay $500 in restitution, which reflects in part the role the defendants played in the riot on January 6.[4] Plea Agreement at ¶ 11. As the plea agreements reflect, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Estey's and Belger's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 96.

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

**Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Estey to 30 days' incarceration on Count Four and, consistent with the plea agreement in this case, $500 in restitution; and recommends that this Court sentence Belger to 45 days' incarceration on Count Four and, consistent with the plea agreement in this case, $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Estey's and Belger's liberty as a consequence of their behavior, while recognizing their acceptance of responsibility for their crimes.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

</div>

By:      s/ *Zachary Phillips*
         Zachary Phillips
         Assistant United States Attorney
         Colorado Bar 31251
         District of Colorado (on detail USADC)
         1801 California Street, Suite 1600
         Denver, CO 80202
         720-281-1161
         Zachary.phillips@usdoj.gov